Argued March 16, affirmed April 8, petition for rehearing denied
May 4, petition for review denied June 9, 1971

## STATE OF OREGON, *Respondent, v.*
## RUSSELL LOREN OBREMSKI, *Appellant.*

483 P2d 467

*J. Marvin Kuhn*, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*Thomas H. Denney*, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and Jacob B. Tanzer, Solicitor General, Salem.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Defendant appeals from conviction under two indictments, each charging him with first degree murder. They were consolidated for trial. One charged him with the slaying of LaVerna May Lowe on February 3, 1969. The other charged him with the slaying of Betty Ann Ritchie on the same day. Defendant pled not guilty to each indictment and gave notice of intent to rely on insanity as a defense.

He makes four assignments of error relating to (1) search of an automobile, (2) failure to instruct on effect of intoxication of defendant under the state's

theory of felony murder relating to the second indictment, (3) denial of a mistrial when a witness related hearsay testimony, and (4) hearsay testimony which was received for impeachment purposes.

The evidence disclosed that on February 1, 1969, the defendant had come from Klamath Falls to Medford in a large, green truck loaded with hay. He accompanied a Mr. Slaughter, who owned the truck, the hay, and a pistol which was in the truck. En route Slaughter was accidentally shot in a leg by the pistol and defendant delivered him to a Medford hospital. Mr. and Mrs. Lowe were friends of Slaughter, and as a result of a contact made with them defendant started staying at their home on February 1. He was to unload the hay. The pistol was in the truck. During the next few days defendant drove the truck a good deal around the Medford area.

On February 3, after the noon hour, Mrs. Lowe was shot several times and killed in her home. Defendant was seen about the Lowe house by neighbors and driving the truck away from the area at approximately that time. Mr. Lowe was away at work. At about 2:00 a.m. February 4, Mrs. Ritchie was found slain alongside Carberry Creek Road, which is a mountainous area in Jackson County, of which Medford is the county seat. She was shot and had been dead from 4 to 12 hours. Several people testified they had seen defendant with Mrs. Ritchie in her red vehicle during the afternoon of February 3. The green truck was found abandoned in the parking lot from which Mrs. Ritchie and her red vehicle had disappeared. The circumstances of some of these sightings aroused suspicion, so much so that one witness had called the sheriff to report it, and the search which resulted in

finding her body followed. Defendant was seen alone drinking beer in a tavern in the area about 6.00 p.m.

Defendant was apprehended by a deputy sheriff at about 2:00 p.m. the next day as he was driving Mrs. Ritchie's red vehicle in Santa Cruz County, California. Reports had been made there of a man in such a car with Oregon license plates who had tried to pick up someone, threatening the latter with a pistol. The officer had to force defendant's vehicle to stop, and when defendant kept his right hand out of sight the officer apprehended him at shotgun point. A loaded pistol, which the officer could see when defendant opened the vehicle door, was lying on the floor on the driver's side. The officer arrested defendant on an illegal gun charge.

A half-empty tube of glue was found in defendant's shirt pocket. A search of the red vehicle turned up empty beer containers, two glue tubes, some credit cards and other papers belonging to Mrs. Ritchie, and women's hose. Thirty minutes later the California police received notice that defendant was being sought for the murders in Oregon. A further search, based on a warrant issued pursuant to an affidavit of an Oregon police officer reciting evidence gathered in Oregon by him, disclosed blood stains in the vehicle that matched Mrs. Ritchie's blood type.

Evidence in support of the insanity plea indicated that defendant had been in trouble since childhood and that he sniffed glue frequently, after which he appeared intoxicated and acted in a bizarre manner.

Psychiatric testimony was conflicting—some supporting the theory of insanity, other disagreeing with it.

(1). The first assignment of error is that the court should not have denied defendant's motion to

suppress the evidence which police obtained when they searched Mrs. Ritchie's automobile. The trial court held that defendant had no standing for the motion because the vehicle was not his—his possession was through theft.

■ We find that it is unnecessary to consider the question of defendant's standing to challenge the search because regardless of the answer to that question, the searches were proper. A search warrant was obtained upon the independent affidavit of an Oregon police officer based upon the belief that blood stains would be in the vehicle because of the events the policeman knew, and in the affidavit related, had occurred in Oregon. The preceding search by California police was based upon a legitimate arrest for illegally having a loaded pistol. After arresting defendant, the officers were justified in a further search of the vehicle. *State v. Keith,* 2 Or App 133, 465 P2d 724, Sup Ct *review denied* (1970).

The trial court properly overruled the motion to suppress.

■ ■ The defendant asserts that the court erroneously failed to instruct concerning the effect of intoxication upon the intent necessary in an armed robbery. It was a theory of the prosecution that defendant killed Mrs. Ritchie in the course of an armed robbery in which he took her vehicle, and, therefore, in that respect he was guilty of felony first degree murder under ORS 163.010.

The court fully instructed the jury as to the elements of first and second degree murder and manslaughter under both indictments, and then, with respect to the indictment charging the murder of Mrs. Ritchie, gave a complete instruction based on the

felony-murder theory. Following this, the court fully instructed on the insanity defense. Immediately following was the statutory instruction, requested by defendant, concerning the effects of intoxication. A part of that instruction was:

"\* \* \* If you find that the defendant's mental state was such, even though the result of voluntary intoxication, that he was incapable of forming the necessary purpose, deliberation, premeditation *or* malice *or the requisite intent* to constitute the crime charged \* \* \* he cannot be found guilty *of a crime involving such* purpose, deliberation, premeditation, malice *or intent.*" (Emphasis supplied.)

In his instructions defining first and second degree murder and manslaughter, the judge used the words "purposely," "premeditated," "deliberate," "malice," and "voluntarily." He did not use the word "intent" in any form. When he instructed on felony murder based on the armed robbery theory, he stated that there must have been a "specific intent" on the part of the defendant to rob, and that defendant must be found beyond a reasonable doubt to have committed or attempted armed robbery. Obviously, the instruction quoted above adequately covered the subject.

(3). Defendant assigns as error refusal to grant a mistrial when a prosecution witness gave unresponsive hearsay testimony. Clifford Lowe, husband of the victim Mrs. Lowe, testified as a prosecution witness about a telephone call he made to his home on the day she was slain:

"Q [THE PROSECUTOR] Did you call your wife during that day?

"A Yes, I did.

"Q What time of day did you call her?

"A One thirty.

"Q Now, we can't discuss what she said to you on the telephone, Mr. Lowe, but you can tell the jury what you told her at that time.

"MR. FORD: If the Court please, I would object to any statements that this witness may have made to a third party, particularly outside the hearing of the defendant.

"THE COURT: I will overrule the objection.

"Q What did you tell your wife?
"A I don't recall exactly what I told her * * * Just talked to her.
"* * * * * *

"Q * * * [Y]ou can say what questions you asked her but not any answers that she might have given.

"MR. FORD: May I have a continuing objection?

"THE COURT: You may.

"Q Go ahead.
"A I asked her who was at the house and she said, 'Mr. Obremski'.

"Q Now, you can't say what she answered back, Mr. Lowe.

"THE COURT: I will instruct the jury to disregard that last answer.

"Q All right. Was there anything about your wife as you talked to her on the telephone that seemed abnormal to you?
"A No."

The defendant immediately moved for a mistrial. The court observed it did not believe the objectionable hearsay would be prejudicial and denied the motion.

■ The answer was incompetent hearsay and prejudicial if not corrected. The court immediately told

the jury to disregard it. The question is whether the answer was so prejudicial that the correction was insufficient.

Several people testified to having seen a green truck at or leaving the Lowe residence after some of them heard screaming and shots there in the early afternoon of February 3. Thus, there was other clearcut evidence tending to place defendant there at the time of the slaying. The prosecutor legitimately questioned Mr. Lowe about the telephone conversation, because it evidenced that Mrs. Lowe was alive and well shortly prior to the time other witnesses saw the truck leave.

■ The granting of a mistrial is largely discretionary with the trial judge. *State v. Smallwood,* 5 Or App 245, 481 P2d 378 (1971). We find no reason to believe the jury disregarded the court's curative instruction and we find no abuse of discretion.

In *State v. Jackson,* 221 Or 315, 351 P2d 439 (1960), the court said:

"* * * and as a matter of practice a conviction will rarely be reversed if a curative instruction is given. This is true even in capital cases * * * [citing authorities]."

■ ■ Defendant contends it was error to allow a prisoner named Holder to testify that another prisoner, named Carruthers, had told him (Holder) that he had heard defendant make incriminating statements while they were in the Jackson County jail together. This came about by reason of the prosecution calling two prisoners who testified to incriminating statements they said the defendant made in their presence. To rebut this, defendant called Carruthers and Holder as

witnesses. Both testified they were present and heard no such statements. However, on cross-examination the prosecutor confronted Holder with a previous statement he had made to a police officer that he had heard the incriminating statements. Holder immediately changed his story and testified he had heard the incriminating statements. Then, over objection, he testified that Carruthers had told him that he also had heard the incriminating statements. With reference to the objection, the court said, "* * * I will admit that * * * *for the purpose of impeachment of a prior witness."* (Emphasis supplied.) ORS 45.610 provides that a witness may be impeached by evidence that he has made prior statements inconsistent to his own testimony. ORS 45.600 provides that a witness may be impeached by the party against whom he is called, by contradictory evidence. The method by which Holder's testimony was impeached was proper under ORS 45.610. The method by which Holder, in answer to the prosecutor's (the party against whom Carruthers was called) cross-examination, impeached Carruther's testimony was proper under ORS 45.600. The court properly limited this, in the presence of the jury, to "impeachment of a prior witness." If the defense had wished for a more detailed limiting instruction it should have requested one. *State v. Charles,* 3 Or App 172, 469 P2d 792, Sup Ct *review denied* (1970) ; *State v. Andrews,* 2 Or App 595, 469 P2d 802, Sup Ct *review denied* (1970).

Affirmed.